# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

v.

MIGUEL A. CRUZ-MONTAÑEZ,

Defendant.

Criminal No. 16-467 (ADC)

## OPINION & ORDER

By an indictment, dated July 21, 2016, a Grand Jury charged defendant Miguel A. Cruz-Montañez ("Cruz") with one count of possession of ammunition by a convicted felon, 18 U.S.C. § 922(g)(1) and 924(a)(2). **ECF No. 7**. The complaint alleges that, on or about July 12, 2016, Puerto Rico Police ("PRP") officers searched defendant's vehicle and found a single magazine containing nine rounds of .40 caliber ammunition. **ECF Nos. 1, 1-1**.

Defendant now moves the Court to suppress the evidence seized from his vehicle, as well as the statements he later gave to PRP officers and a Homeland Security Investigation Special Agent, on the ground that they were obtained in violation of his Fourth Amendment rights. **ECF No. 13**. The government opposes defendant's motion and argues that the PRP officers had reasonable suspicion to stop and search defendant's vehicle because the PRP officer who stopped Cruz saw him publicly display a firearm by placing it in his front pocket. **ECF No. 16**. The government further argues that, after PRP officers stopped him, defendant voluntarily consented to the search of his vehicle. *Id.*

On December 5 and 13, 2016, the Court held an evidentiary hearing on the motion to suppress. **ECF Nos. 21, 22, 23**. The Court heard the testimony of PRP Officers Eric J. Cotto-Matos ("Cotto") and Jorge Luis Torres-Alicea ("Torres"), as well as the testimony of defendant Cruz.

## I.      Findings of fact

Defendant Miguel Cruz-Montañez was born and raised in the smaller island of Vieques, Puerto Rico. Since 2003, he has lived within the district in the Municipality of Patillas. He works various jobs, including collecting and selling coconuts in Humacao, and fishing the waters near Vieques. Every other Tuesday he usually sails his boat from Yabucoa to Vieques, where he stays at his uncle's house until Saturday to be closer to the Vieques fishing grounds.

Officers Cotto and Torres are assigned to the Intelligence Unit of the Puerto Rico Joint Forces of Rapid Action (Spanish acronym, "FURA"), where they investigate drug trafficking in the eastern region of Puerto Rico, including the islands of Vieques and Culebra. The officers have the authority to guide their own investigations.

On July 12, 2016, around 4:00 p. m., Officers Cotto and Torres were in an unmarked Ford Explorer heading west on Route 3. Cotto was driving, and Torres was in the front passenger seat. On that day, they were headed to conduct surveillance of and corroborate if defendant and a vessel he owned were at defendant's house or not, in which case, presumably defendant could be in Vieques or Culebra. As they were driving, Cotto saw a blue Grand Cherokee towing a boat,

heading in the opposite direction, which he recognized as belonging to defendant.[1] Cotto immediately turned around and followed defendant.

As soon as he saw defendant, Officer Cotto also called his supervisor and informed him that they had located Cruz. Having turned around to follow defendant, Cotto placed a call to a Lieutenant from the Maritime Unit. Cotto requested for a canine unit to meet them at the Yabucoa slipway, where defendant was presumably headed.[2]

After thirty to forty minutes, Cruz stopped next to a fruit stand on the right side of the road. The vessel being hauled was adjacent to the fruit stand. The officers stopped about ten to twelve car lengths directly behind defendant's vehicle and trailer, on the right shoulder and close to some orange drums. *See* Exhibit A1 and A9. According to Cotto's testimony, defendant parked "next to the fruit stand between the lane and the shoulder." From this distance, Officer Cotto asserts that he observed the Grand Cherokee with binoculars. Cotto testified that he saw Cruz step out of the vehicle from the driver's side, turn around, bend over and reach into the vehicle, pull out a black pistol, and place it in his short's right pocket. Cotto further testified that he saw the gun for 2 or 3 seconds before Cruz pocketed it. Cotto and Torres never called their superior to inform that they had seen a gun, or to request that the canine unit that had already been requested be one trained to detect firearms.

---

[1]      Agent Cotto indicated that he recognized the vessel because he "had seen pictures of it at the Maritime Unit" and had seen it at "The Isabel II pier," and because fellow agents "had talked about it."

[2]      During his testimony, Cotto tried to distance himself from the fact that he had requested the deployment of a canine unit. In cross-examination, when asked if he had asked for the canine unit, he evaded a direct response by saying "my supervisor said he was to request one," and even denied having done so.

Agent Cotto's narrative of the events reflects that Cruz exited his vehicle from the driver's side, walked around the front of the vehicle, and went into the fruit stand, where he was out of Cotto's view for five or seven minutes. After spending some time in the fruit stand, Cruz returned to his vehicle and continued driving down the same road. The officers followed him for approximately four minutes, until Cruz turned left and drove into a fish shop with a slipway for launching boats. The slipway is located in a wide, open area, in close proximity to the FURA Maritime Unit facilities. The officers did not follow Cruz, but continued driving towards the end of the road to get a better view of Cruz. They could not find a viewpoint, so they turned around and drove into the fish shop. Once in the area, they saw Cruz reversing the Grand Cherokee and the boat trailer into the slipway.

Cruz was driving the vehicle and trailer in reverse, guiding the trailer towards the left side of the vehicle, aligning it with the slipway. The Grand Cherokee and trailer were at an angle to each other. The officers drove up with their sirens on and screeched to a halt about three feet from Cruz's vehicle, between the trailer and the Grand Cheroke.[3]  The officers positioned their unmarked vehicle so that it blocked Cruz from continuing in reverse towards the slipway or from moving forward. They exited their vehicle with weapons drawn. Officer Cotto walked over to the driver's side of Cruz's vehicle while Torres approached from the passenger's side.

---

[3]      Agent Torres-Alicea, whose testimony remains more credible and reasonably sound, described this as the vehicle's location. Agent Cotto, having testified that both vehicles were side-by-side, was clearly contradicted by his fellow agent.

Officer Cotto identified himself as a FURA officer. When Cruz inquired about the reasons for the intervention, Cotto explained that they were to verify and examine the registration documents for the vessel and vehicle. Cruz got upset and expressed frustration that FURA was stopping him again. Reportedly, FURA officers had stopped him at sea four times in the last two months.

The last of these interventions had happened on June 17, 2016, when Officer Alexis Rodríguez-Rodríguez ("Rodríguez") of FURA stopped Cruz at sea. Officer Rodríguez told Cruz that he wanted to check his vessel and ensure compliance with maritime regulations, and he asked Cruz to follow him to Ceiba. Cruz told the officer that, if he wanted, he would follow him to Yabucoa, where he stored his trailer and FURA had a Maritime Unit. Once they were at Yabucoa, Officer Rodríguez asked Cruz to dock his vessel at the FURA dock. Upon arrival, a canine unit that was awaiting searched his vessel. FURA officers asked for Cruz's license and the vessel's registration. Cruz handed over the papers, which he kept in an orange tackle box, and notified the officers that he had fish and lobsters that he needed to sell before they died. Officer Rodríguez then asked if he could board and search the vessel. Cruz asked if that would make any difference. Officer Rodríguez replied that it would not, and that he would check his vessel anyways. After the search, Officer Rodríguez issued Cruz a ticket, fining him fifty dollars for missing certain safety equipment. The ticket had defendant's full name, address, and the last four digits of his social security number, as well as the vessel's name and registration number. *See* Exhibit D.

The other three interventions by FURA officers also took place in the waters between Vieques and Puerto Rico.[4] During the first intervention, defendant was fishing during the morning with his uncle and two cousins. A FURA boat stopped their vessel and asked for their identifications and vessel registration documents. After confirming that the vessel's registration was in order, the FURA officers let the boat go, although they followed it into the fishing grounds.

That same day, a second FURA boat intervened with defendant and his family. The FURA officers asked for the documents and registration for the vessel. Cruz got upset and expressed his frustration over being stopped again by FURA officers. The officers replied that if they had already checked their papers, it was "ok", and left the defendant to continue fishing with his family.

During the third intervention, Defendant was headed to Naguabo—instead of his usual port of Yabucoa—because the sea was rough and Naguabo was closer to Vieques. Once again, a FURA boat stopped his vessel and asked to search his papers and registration for the vessel. After verifying that all the documents were in order, the FURA officers said everything was "ok" and let defendant continue sailing towards Naguabo. Cruz also testified that the man who brought the trailer for his vessel to his home—because he had originally sailed from Yabucoa— was stopped on the road by FURA officers.

---

[4]      Cruz testified that, although he could not recall specific dates for the incidents, they all took place approximately 2 months before the July 12, 2016, intervention that spawned this case.

At the site of the intervention, on July 12, 2016, Cruz handed his driver's licence and vehicle registration to Torres, as well as the licence and registration for his vessel. Cruz responded to the officer's questions, and eventually gave the officers the requested documents. Cruz also informed them that he did not have a valid driver's license.[5] Defendant was ordered out of the vehicle, asked to pull up his shirt, and was padded on his waist and pocket by Cotto. He was also asked whether he had a weapon's license or was carrying a weapon. To the last two questions, Cruz answered in the negative. At the evidentiary hearing, Torres and Cotto remained evasive when asked about Cruz's conduct and statements at the time of the intervention. However, Cruz testified that once told by Cotto that he was being stopped to have his registration reviewed, he got upset and said "once again" and kept inquiring about the reasons they kept stopping him. He kept arguing with Cotto, who in turn was yelling at Cruz that he was going to take him to court and accuse him. It came a point where Torres, in what appears an attempt to ease the situation, simply told Cruz to hand over the documents.

Approximately ten minutes after Cotto and Torres stopped Cruz, a canine unit arrived at the fish shop. The canine handler walked over to Cruz's car and greeted defendant by asking him if he had been able to sell the lobsters he had in his boat back in June. The canine handler then told Cotto that he had searched Cruz's boat before. Cotto responded that it did not matter because he was going to search Cruz again. Hearing this exchange, Cruz told the officers to go ahead and search the vehicle, since they were going to search it anyway, as they had done before.

---

[5]      Both Officer Cotto and Officer Torres omitted and made no reference to defendant's lack of a valid driver's license during their testimony. No ticket for such alleged infractions appears to have been issued.

Cruz testified that at the time Cotto was upset and kept yelling at him. He also recalled that Cotto told him "I know you, where you live, where you go and where you go in Vieques." Cruz also testified having asked whether he could use his cellphone to take a video and Cotto denied authorization. Actually, he testified that he was not allowed to use his cellphone. Cruz asked whether he was arrested but recalled that Cotto simply kept arguing and did not answer.[6]

As the canine unit was getting ready to search the vehicle, Cruz and the officers were standing near the front of the Grand Cherokee. At this moment, Cruz heard Officer Torres tell Officer Cotto to "give him the papers to sign." The officers could not find the papers, but eventually produced a consent-to-search form. Cotto asked Cruz to sign the consent form, indicating that it authorized them to search his vehicle and vessel. Cruz replied that he would sign it because they were going to search anyway.[7] By the time Cruz finally signed the consent form, the canine unit was already searching his vehicle.

The canine unit searched the vehicle but nothing was found.[8] Officer Cotto told Officer Torres to search the vehicle, and Torres found a magazine with nine .40 caliber rounds, along with some papers within the compartment or console between the front seats. Officer Cotto immediately arrested Cruz. Once the magazines and ammunitions were found, Cruz was asked where the weapon was. Cruz replied that once before he had bought a weapon but had thrown it at sea. Nonetheless, he had totally forgotten about the magazine and ammunitions that had

---

[6]       However, Cotto and Cruz testified that had defendant attempted to leave, they would have arrested him.
[7]       Cruz testified that Cotto told him the papers were for him to sign because they were to conduct the search anyway.
[8]       Cotto and Torres indicated that the dog alerted positive by sitting on the driver's seat. Cruz testified that Cotto asked the canine handler what had been found, to which the handler responded that all was clean.

remained in the console. Torres testified that once the magazine was found, Cruz was placed under arrest and read his Miranda rights.

Cotto testified that, while at the site, he and Torres searched the area looking for the weapon. However, Officer Torres denied having seen Cotto searching the area and assured he had not done it nor assisted Cotto in such venture. Based on Torres's testimony, Cotto's testimony is discredited.

After the arrest, Cruz was transported to the FURA Maritime Unit, located right next to the fish shop and slipway, where he was booked. Based on Cruz's testimony, Cotto kept urging him to tell him where the weapon was. Cotto even threatened Cruz to have his home searched or making his arrest public, an event that could hurt and have adverse consequences for Cruz's wife.[9] Whether at the arresting site or at the Maritime Unit, Cruz's testimony has remained consistent: that he once possessed a weapon, that he had discarded it while in open sea, and that he had completely forgotten the magazines and ammunitions were in the console. That same day, a couple of hours after his arrest, Homeland Security Agents undertook custody and interrogated Cruz.

Throughout direct and cross-examination, Cruz was also highly consistent while explaining: FURA's prior interventions with him (two in high seas, one in Naguabo, one at the Yabucoa Maritime Unit); the fact that he was unduly kept under surveillance; that he was being harassed by FURA agent; and that on July 12, 2016, the date of the events, he felt and understood

---

[9]     Reportedly, Cotto knew that Cruz's wife worked at the Guayama courthouse and understood that adverse publicity could affect her work environment.

he was under arrest while the agents stopped and questioned him. Cruz also made clear that since under maritime regulations he cannot refuse boarding and checking of documents by law enforcement officers, he believed FURA agents were exceeding their authority and abusing the power conferred upon them.

## II.     Discussion

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Cont. amend. IV. "Warrantless searches are *per se* unreasonable under the Fourth Amendment, unless 'one of a few specifically established and well-delineated exceptions' applies." *United States v. Camacho*, 661 F.3d 718, 724 (1st Cir. 2011) (quoting *Arizona v. Gant,* 556 U.S. 332, 338 (2009)). The federal "prohibition on unreasonable searches and seizures is enforced through the exclusionary rule, which excludes evidence seized in violation of the Fourth Amendment." *Id.* (citing *Terry* v. *Ohio*, 392 U.S. 1, 9 (1968). "Exclusion is not an automatic consequence of a Fourth Amendment violation, but rather is available only where the benefits of deterring the police misconduct that produced the violation outweigh the costs of excluding relevant evidence." *United States* v. *Thomas*, 736 F.3d 54, 60 (1st Cir. 2013) (citing *Herring* v. *United States*, 555 U.S. 135, 141 (2009)).

### A.     The initial stop

One of the exception to warrantless searches and seizures establishes that a "police officer may briefly detain an individual for questioning if the officer 'reasonably suspects that the person apprehended is committing or has committed a crime'" *Camacho*, 661 F.3d at 726 (quoting *Arizona*, 556 U.S. at 323). An encounter between an officer and an individual rises to the level of a seizure and triggers the Fourth Amendment's protection when "a police officer 'has in some

way restrained the liberty of a citizen' through 'physical force or show of authority.'" *Id.* at 725

(quoting *Terry*, 392 U.S. at 19 n.16). "To determine whether an officer has restricted an

individual's freedom of movement, courts determine the 'coercive effect of the encounter' by

asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise

terminate the encounter.'" *Id.* (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)).

   A show of authority occurs "only when 'in view of all the circumstances surrounding the

incident, a reasonable person would have believed that he was not free to leave.'" *United States

v. Fields*, 823 F.3d 20, 25 (2016) (quoting *United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980)).

Factors to consider include: "the threatening presence of several officers, the display of a weapon

by an officer, some physical touching of the person of the citizen, or the use of language or tone

of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*,

446 U.S. at 554. To constitute a seizure under the Fourth Amendment, the individual must

submit to the officer's show of authority, for example, by answering the officer's questions.

*Fields*, 823 F.3d at 25.

   Here, the officers' intervention was a seizure that activated the Fourth Amendment's

protections. When the officers intervened, Cruz was driving his vehicle, reversing his boat

towards the slipway. The officers drove up with their sirens on and screeched to a halt about

three feet away from Cruz's vehicle and trailer, positioning their vehicle in such a way that it

blocked Cruz from moving or reversing into the slipway. The officers exited their vehicle with

weapons drawn, and asked Cruz for his driver's licence and vehicle registration, as well as the

licence and registration for his vessel. Cruz was questioned on whether he had a weapons

permit, was told to lift his shirt, and was padded down. Cruz submitted to this show of authority by stepping out of his vehicle, responding to the officer's questions, complying with their requests, and handing them the requested documents.

Based on Cotto's explanation to Cruz, all these demands were prompted by the alleged objective of inspecting his documents to ensure compliance with regulations. More so, minutes later, other agents and a canine unit arrived. While Cruz, already upset, kept questioning why he was being intervened, Cotto was yelling at him and threatening to have him taken to court and arrested. During the course of the search and thereafter, Cruz's freedom of movement was restrained, and he was told to stand next to an agent by the truck's passenger side. When Cruz asked to use his cell phone, authorization was denied, and when he asked if he was under arrest, he was ignored. However, based on the agent's testimonies, had Cruz attempted to leave he would have been precluded from doing so.

As Cruz stated, any reasonable person would have concluded he was under arrest. Under the totality of the circumstances, a reasonable person in Cruz's position would not feel free to "disregard the police and go about his business." *Camacho*, 661 F.3d at 725-26 (citations omitted) (holding that officers who intentionally blocked defendant's path with their vehicles, stepped out of their vehicles and confronted him with accusatory questions, and ordered defendant to place his hands on the hood of the car, constituted a seizure rather than a casual encounter).

When an officer has reasonable suspicion that an individual is engaged in criminal activity, he may execute a *Terry* stop "without running afoul of the Fourth Amendment." *Fields*, 823 F.3d at 25. Nonetheless, "a police officer must have a reasonable, articulable suspicion of an

individual's involvement in some criminal activity in order to make the initial stop." *United States v. Ruidíaz*, 529 F.3d 25, 28 (1st Cir. 2008). The reasonable suspicion standard "demands a particularized and objective basis for suspecting the person stopped of criminal activity. . . [T]he suspicion must be both objectively reasonable and founded in specific and articulable facts." *Camacho*, 661 F.3d at 726 (quotations omitted). The "reasonableness" of the officer's suspicion "must be judged according to objective criteria; it is not dependent on an individual officer's subjective motives." *Ruidíaz*, 529 F.3d at 28. "This inquiry is fact-sensitive" and the court's determination requires "a measurable degree of deference to the perceptions of experienced law enforcement officers." *Id.* at 29.

In this case, the government argues that the officers had reasonable suspicion to stop defendant Cruz because Officer Cotto had observed Cruz take a black pistol from his vehicle and place it in his pocket. This is the only reason proffered to justify the officers' intervention, inasmuch as both officers testified that Cruz did not commit any traffic violations while he was being followed and kept under surveillance. However, after carefully considering the testimony heard during the evidentiary hearing, the Court does not credit Cotto's testimony that he had observed defendant in possession of a firearm. His testimony lacked credibility, particularly in light of his demeanor and lack of candidness.[10]

---

[10]     When pressed during cross-examination, Cotto added details to buttress his claim that he had seen Cruz pocket a weapon. For example, on direct examination, he testified that he saw Cruz place the weapon in his pocket, go into the fruit stand, and later back into his vehicle. However, during cross-examination, Cotto testified that he could also see a bulge in defendant's pocket after he allegedly placed the gun in his front right pocket. This testimony only came about after the defense counsel explicitly asked Cotto if he could see a bulge in defendant's pocket.

Even more important is whether Cotto, the only person who for 2 to 3 seconds saw defendant in possession of a weapon, could have actually observed what he testified about.

At the hearing, Cotto and Torres testified in regards to the events that led to Cruz's arrest. That day, Torres was to provide back-up to a surveillance Cotto decided to carry out. Upon encountering Cruz's vehicle towing the vessel, Cotto immediately turned around to follow. While so doing, he called the Maritime Unit and asked for a canine unit to be deployed to the Yabucoa pier, where they eventually encountered Cruz. Officer Torres overheard Cotto while asking for the canine. Clearly, Cotto had his mind set on the fact that he was to stop Cruz and, once again, have his vessel and vehicle searched.

After following Cruz for over 30 minutes, Cruz stopped at an intersection "between the shoulder and right lane" of the road, right next to a fruit stand.[11] Cotto stopped his unmarked vehicle on the road shoulder, at a distance of 10-12 vehicles behind the SUV and trailer being towed. At the hearing, Torres candidly admitted that from his position on the passenger's seat, he could not see and never saw Cruz while allegedly grabbing a pistol from inside the vehicle. Whether Cotto could have actually observed what he testified about is highly questionable. First, because Cotto's vehicle remained further away and at an inner position within the road

---

During cross-examination Officer Cotto also testified that he searched the area around Cruz's car and slipway for the firearm he allegedly saw. The gun was never found. He further testified that he searched the area with his partner, Officer Torres. However, Torres testified, with candor, that he had not observed Cotto searching the area, and that he had not searched the area with Cotto. In light of the contradictory testimony (in this and other facts) and Cotto's demeanor, the Court finds that Torres's testimony is more credible. Cotto never searched the area for the weapon.

[11]     *See* Exhibits A1, A9. Cotto's testimony was that Cruz stopped where the grey vehicle is depicted in the picture.

shoulder. Second, the trailer presumable obstructed the view of the driver's side of Cruz's Grand Cherokee. Third, at all times defendant remained under surveillance. However, Cotto and Torres never observed him throw anything away from the vehicle. Ultimately, no weapon was found and Cotto and Torres never searched for it within the perimeter where Cruz was detained.

In addition, Cotto had preliminary arranged for the presence of a canine unit even before observing defendant allegedly engage in illegal conduct. Clearly, Cotto's intent was that of searching this vehicle and vessel. Cotto's alleged observations simply and conveniently served to fill the vacuum and absence of reasonable suspicion to search.

Therefore, the officers lacked reasonable suspicion to stop Cruz, and the Fourth Amendment prohibited their initial seizure of Cruz. In any event, the subsequent search of defendant's vehicle was far broader than the limited pat down for a weapon that *Terry* authorizes, and the search of a vehicle for a weapon requires probable cause. *See United States* v. *White*, 804 F.3d 132, 136 (1st Cir. 2015) (quoting *United States* v. *Silva*, 742 F.3d 1, 7 (1st Cir. 2014)).

**B.     Consent to search**

The government also argues that the search of Cruz's vehicle is justified by a second exception to the Fourth Amendment's prohibition against warrantless searches and seizures: that Cruz consented to the search.

To rely on consent as justification for a search, the government has the burden of demonstrating that the consent was voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1973). "For consent to a search to be valid, the government must prove by a preponderance of the evidence that the consent was uncoerced." *United States v. Bey*, 825 F.3d 75, 80 (1st Cir. 2016)

(citing *United States v. Vanvliet*, 542 F.3d 259, 264 (1st Cir. 2008)). "The presence of coercion is a question of fact based on the totality of the circumstances, including 'the consenting party's knowledge of the right to refuse consent; the consenting party's possibly vulnerable subjective state; and evidence of inherently coercive tactics, either in the nature of police questioning or in the environment in which the questioning took place.'" *Id.* (quoting *United States v. Twomey*, 884 F.2d 46, 51 (1st Cir. 1989)).

"Consent is not freely given, and therefore may be rendered invalid, if a reasonable person would have believed that his or her 'consent' was required by police officers or coerced." *Goodrich*, 183 F. Supp. at 145 (citing *Florida v. Bostick*, 501 U.S. 429, 437 (1991). Therefore, when an individual consents to a search because he recognizes that the search would be performed irrespective of his consent, his consent is not voluntary. *See United States v. Barnes*, 506 F.3d 58, 63 n.6 (1st Cir. 2007) (citing *Schneckloth*, 412 U.S. at 233 ("[I]f under all the circumstances it has appeared that the consent was not given voluntarily—that it was coerced by threats or force, or granted only in submission to a claim of lawful authority—then we have found the consent invalid and the search unreasonable.") (then citing *United States v. Pérez–Montañez*, 202 F.3d 434, 438 (1st Cir. 2000) (requiring "more than mere acquiescence in the face of an unfounded claim of present lawful authority")).

Here, the preponderance of the evidence and totality of circumstances lead the Court to conclude that Cruz did not voluntarily consent to the search. First, Cruz was stopped under the pretext to have his vehicle and vessel's registration documents inspected. Cruz understood he could not refuse this. However, five minutes after being stopped, at Officer Cotto's request the

canine and its handler, a law enforcement agent, arrived, and the true motives of the stop were clear. While Cruz got upset and questioned Cotto's motives to search, Cotto was yelling at Cruz and made clear that a search was to be conducted no matter what (i.e.: Agent Rodríguez saying he had recently searched the vessel and Cotto instructing him to search again).

Second, it cannot be concluded that Cruz gave proper and valid verbal consent to have his vehicle and vessel searched. The officers indicated, implicitly and explicitly, that they would search Cruz's vehicle and vessel with or without his consent. Cruz merely expressed that they could do as they wished and that they could search the vehicle because they were going to search it anyway. *See United States v. Escobar*, 389 F.3d 781, 786 (8th Cir. 2004) ("Simply telling a police officer to '[g]o ahead' with a search is not, in and of itself, proof of voluntary consent.") (quoting *United States v. Morgan*, 270 F.3d 625, 631-32 (8th Cir. 2001). Third, Cruz signed the consent form either as the drug-sniffing dog had started searching his vehicle, or shortly thereafter. *See Id.* at 786 (holding that consent was not voluntary because police officer's representation that a drug-sniffing dog had marked defendant's bag communicated that probable cause to search existed and defendant had no choice but to permit search). Thus, Cruz's consent was not "the product of an essentially free and unconstrained choice." *United States v. Brake*, 666 F.3d 800, 806 (1st Cir. 2011) (internal quotations omitted). Fourth, FURA officers had intervened with defendant on four previous occasions. In each occasion, the officers asked for his documents and vessel registration without first asking for his consent to search his vessel. And in at least one occasion, the FURA officers explicitly told him that they would search his vessel irrespective of whether he consented or not to the search.

Furthermore, even if the Court were to find that Cruz's consent was voluntary, his consent was not purged of the illegal taint of the illegal seizure. When consent is given after an illegal seizure, the court must determine whether the causal link between the illegal seizure and the consent to search "is so tight that the evidence acquired pursuant to that consent must be suppressed." *United States v. Cordero-Rosario*, 786 F.3d 64, 76 (1st Cir. 2015) (citing *United States v. Navedo-Colón*, 996 F.2d 1337, 1338 (1st Cir. 1993)). *See also United States v. Goodrich*, 183 F. Supp. 2d 135, 145 (D. Mass. 2001) ("[w]hen consent follows an illegal act by the police—whether seizure of a person or search of property—the requirement that consent be voluntary is supplemented by a second distinct requirement: that the consent be purged of the taint of the earlier illegal act.") (citing *Navedo-Colón*, 996 F.2d at 1338). Thus, the evidence obtained by consent "may be admitted if it was obtained 'by means sufficiently distinguishable to be purged of the primary taint.'" *United States v. Stark*, 499 F.3d 72, 76 (1st Cir. 2007) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). "When determining attenuation, 'temporal proximity [ ], the presence of intervening circumstances, and, particularly the purpose and flagrancy of the official misconduct are all relevant.'" *Camacho*, 661 F.3d at 729 (quoting *Brown v. Illinois,* 422 U.S. 590, 603–04 (1975)); *see also Goodrich*, 183 F.Supp.2d at 146 (applying *Brown* factors to consent given after illegal seizure).

Two of these factors clearly weigh in favor of suppression. First, the temporal proximity of Cruz's consent was immediate to his illegal seizure, occurring no more than fifteen minutes after the illegal stop. Second, there were no intervening circumstances between the illegal stop

and the alleged consent, as the consent was immediate, and Cruz was detained in the same circumstances and location.

The final *Brown* factor—the purpose and flagrancy of the official misconduct—weighs heavily in finding that the taint of the illegal seizure had not dissipated by the time defendant signed the consent form. This factor also goes to the principles behind the exclusionary rule, which is "designed to safeguard Fourth Amendment rights generally through its deterrent effect." *United States v. Calandra*, 414 U.S. 338, 348 (1974)). Nonetheless, "[e]xclusion is not an automatic consequence of a Fourth Amendment violation, but rather is available only where the benefits of deterring the police misconduct that produced the violation outweigh the costs of excluding relevant evidence. *United States v. Thomas*, 736 F.3d 54, 60 (1st Cir. 2013) (citing *Herring v. United States*, 555 U.S. 135, 141 (2009)).

In this case, the benefits of deterring the police misconduct characterized in this Opinion and Order, heavily outweighs the cost of excluding the relevant evidence. The Court surmises that the firearm that Officer Cotto claims to have seen was a pretext to justify a search that Cotto decided to perform from the moment he encountered Cruz driving in the opposite direction on Route 3. Cotto admitted that he was surveilling Cruz as part of an alleged drug trafficking investigation, and a canine unit was requested as soon as the officers began following Cruz. When Officer Cotto allegedly saw the firearm—forty-five minutes later—he did not update his

supervisor or request a firearm-sniffing dog.[12] Officer Cotto asked for Cruz's consent to search

after indicating, implicitly and expressly, that they would search his vehicle whether or not he

consented to the search. In fact, Cruz signed the consent form after the dog began sniffing the

vehicle. Finally, Cruz signed the consent form immediately after the illegal seizure and while he

was still being detained under the same conditions. Furthermore, Cruz had been subjected to

repeated interventions by the same FURA units the officers belong to. On the stand, officers

Cotto and Torres minimized those interventions.[13]

Furthermore, even if Cruz had voluntarily consented to the search, his consent would not

have been sufficiently attenuated from the taint of the illegal seizure. The magazine and weapon

ammunition, and any statements provided by Cruz, are, thus, "fruit poisoned by the unlawful

seizure." *Camacho*, 661 F.3d at 730. A careful consideration of the totality of the circumstances

---

[12]     On direct examination, Officer Cotto testified that the canine unit was trained to recognize drugs, but later said that it was trained to recognize both weapons and drugs. During cross-examination, however, Cotto changed his testimony and testified that he did not know what the canine unit was trained to search for.

[13]     Officer Cotto denied having any knowledge of the previous interventions. However, he testified that fellow FURA officers had provided him with defendant's alias, "Coquero" (because he picked coconuts for sale), and that he had initiated his investigation of defendant based upon his fellow officer's information. While Officer Cotto testified that he did not hear defendant mention the prior interventions, Officer Torres testified that Cruz mentioned them during the initial stop.

Officers Cotto and Torres also testified that, before June 12, 2016, they had never investigated Cruz. However, Cotto testified that he knew Cruz went by the name of "Coquero" because he worked collecting coconuts in Humacao; and, during cross, he testified that he had gone to Vieques to corroborate if Cruz's boat was moored at the pier in Isabel Segunda. During cross he also testified that both a confidential informant and a fellow officer at the Maritime Unit told him Cruz kept his boat in Vieques. Torres testified and distanced himself from Cotto's actions, indicating that this was Cotto's investigation, and he only provided backup during the intervention.

During cross-examination, Cotto further testified that he did not know that Cruz worked as a fisherman, that he was from Vieques, or that he had family in Vieques. When asked if he knew Cruz had family in Vieques, Cotto hesitated before vehemently denying this knowledge. Nonetheless, after Cruz/s arrest, Cotto threatened Cruz, indicating that he knew where he lived, where he went and stayed while in Vieques, and where his wife worked.

weighs heavily in favor of suppression. Accordingly, the Court **ORDERS THE SUPPRESSION** of the ammunition and magazine found inside Cruz's vehicle.

C.      **Cruz's statements to Agent Camacho**

In its opposition to the motion to suppress, the government argues that defendant's post-arrest statements are not fruit of the poisonous tree because the search and seizure of the vehicle was legal. In the alternative, the government argues that defendant had assistance of counsel of his own choosing when Homeland Security Investigation Special Agent Jorge Camacho ("Agent Camacho") interviewed him after his arrest.

However, Special Agent Camacho did not testify at the evidentiary hearing. "[T]he key inquiry in cases seeking to suppress the indirect fruits of prior illegal law enforcement conduct concerns 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Cordero-Rosario*, 786 F.3d at 75–76 (quoting *Wong Sun,* 371 U.S. at 488). Here, the Court has not heard evidence demonstrating that the taint of the initial illegal search and seizure of Cruz had dissipated by the time Cruz made those statements. Accordingly, the Court **ORDERS THE SUPPRESSION** of the statements that defendant gave to law enforcement officers on July 12, 2016, after his arrest.

III.    **Conclusion**

In light of the above, the Court **GRANTS** defendant's motion to supress, **ECF No. 13**, and **ORDERS THE SUPPRESSION** of the magazine and nine rounds of ammunition found in

defendant's car, as well as the statements defendant made to Officer Torres, Officer Cotto and

Special Agent Camacho on after his arrest on July 12, 2016.

     **SO ORDERED**.

     At San Juan, Puerto Rico, on this 21st day of June 2017.

                        **S/AIDA M. DELGADO-COLÓN**
                        **Chief United States District Judge**